IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PIERRE SALAME AJAMI,         )
                                     )
      Petitioner,            )
                                     )
v.                              )     NO. 3:19-cv-00161
                                   )     JUDGE RICHARDSON
VERONICA TESCARI SOLANO,    )
                                     )
      Respondent.       )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent Veronica Tescari Solano removed her two minor children, "EAST" and "PGST," from their home in Barquisimeto, Iribarren Municipality of Lara State, Venezuela and brought them to the United States. The children's father, Petitioner Pierre Salame Ajami, filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") seeking the return of EAST and PGST (Doc. No. 1, the "Petition"). On July 30, July 31, and August 6, 2019 the Court held the first three days of a bench trial on the Petition. The fourth day was scheduled for August 29, 2019. However, due to the parties' problems securing an interpreter, the fourth and final day of the bench trial was rescheduled and held on December 6, 2019. Throughout the trial, the testimony was provided by witnesses in Spanish, and then translated into English by sworn interpreters.

On December 6, 2019, the parties were instructed to file post-trial affidavits relating to the authenticity of certain documents. Those filings were submitted between December 31, 2019 and January 3, 2020.

Having reviewed the record, the exhibits received in evidence, and the testimony of the witnesses, and after considering the witnesses' interests and demeanor, the Court enters the

following Findings of Fact and Conclusions of Law. To the extent that the Court makes a particular finding, any testimony or other evidence inconsistent with that finding has been rejected by the Court, whether or not such inconsistent testimony or evidence (and the reasons for rejecting it) is specifically discussed herein. Further, the Court omits from its recitation facts that it deems immaterial to the issues presented.

## **BACKGROUND**[1]

Veronica Tescari Solano ("Respondent") and Pierre Salame Ajami ("Petitioner") are both Venezuelan citizens.[2] Petitioner owns a construction company and office supply company in Venezuela. Respondent is an attorney and worked at Toyota for a period of time.[3] Petitioner and Respondent were never married, but they were involved in a romantic relationship which resulted in the birth of their two children, EAST and PGST ("the Children"), who were born in 2011 and 2012, respectively. Petitioner also has a son named Charbel Michel Salame Oliferow from a prior relationship with a different mother. Petitioner, Respondent, EAST, and PGST lived together until Petitioner and Respondent separated (for the first but not last time) in 2014. For a period of time, Charbel also resided with Petitioner, Respondent, and the Children.

Shortly after Petitioner and Respondent's first separation, Respondent filed the first of a number of complaints against Petitioner with the Council of Protection of Boys, Girls, and Adolescents (CPNAI). Respondent did not submit this complaint into evidence during the trial and

---

[1] Unless stated otherwise, the facts set forth in this section are uncontested.

[2] Petitioner is also a citizen of Lebanon.

[3] The Court does not know whether Respondent worked at Toyota as an attorney or worked instead in some other capacity. The Court also does not know the period of time she worked at Toyota.

the Court is unaware of the exact basis for the complaint or its specific contents.[4]  In October 2014, Respondent withdrew the complaint.[5]

When Petitioner and Respondent separated in 2014, Petitioner went to the headquarters of the Public Ministry for the purpose of establishing a "family coexistence regime." Petitioner and Respondent agreed to the regime on September 29, 2014. On October 27, 2014, the Third Court of the First Instance of Mediation and Substantiation and Enforcement of Protection of Children, Girls and Adolescents approved the agreed-upon family coexistence regime ("2014 Coexistence Agreement"). Under the 2014 Coexistence Agreement, Petitioner was authorized to exercise three consecutive days of parenting time with the Children every fifteen days.

Respondent and Petitioner reunited in July 2015. Beginning at that time, Petitioner, Respondent, EAST, and PGST lived together with Respondent's mother until the parties separated for a second time in December 2016.

On or around December 17, 2017, Respondent filed a request for travel authorization seeking permission from the court in Venezuela to travel to the United States for five months with EAST and PGST. Petitioner opposed the travel authorization request based upon his concern that Petitioner was not actually seeking permission to travel but was planning on applying for political asylum in the United States. Petitioner attached to his opposition, *inter alia*, photographs from Respondent's social media account of Respondent participating in protests against the Maduro

---

[4] Respondent testified that part of the basis for the 2014 complaint to the CPNAI was an incident between Petitioner and one of the Children involving a "comb" (discussed below), although the Court wonders whether the more accurately translation from the Spanish-language testimony would have been "brush." Respondent also testified that this incident was not the main reason for the complaint.

[5] Respondent testified that she withdrew the complaint because Petitioner had threatened that if she did not remove the complaint he would talk to Amalia Saez, the head of the CPNAI.

Government, with opposition leaders, and selling (or exchanging) her car.[6] The court in Venezuela never resolved Respondent's travel authorization request. A second hearing on the matter was scheduled for July 23, 2019, but Respondent did not appear.

On or around December 28, 2017, Respondent filed a complaint in Venezuela against Petitioner alleging that he was abusing her psychologically. As part of this case, Petitioner and Respondent underwent psychological evaluations. Based on the results of the parties' psychological exams, the case was dismissed. Respondent appealed that dismissal in February 2018. The appeal was denied in April 2019.

In June 2018, Petitioner filed a petition in the court in Venezuela seeking to establish a new coexistence agreement. Soon after, the parties entered into a new coexistence agreement ("2018 Coexistence Agreement"). The 2018 Coexistence Agreement expanded Petitioner's access to the Children, permitting Petitioner to see the Children on Tuesdays, Thursdays, and every other weekend.

On July 28, 2018, Respondent, EAST, and PGST exited Venezuela via the land border between Venezuela and Colombia into the Colombian city of Cucuta. On July 31, 2018, Respondent and the Children entered the United States through Orlando, Florida and thereafter moved in with Respondent's mother and sister in Murfreesboro, Tennessee.

Petitioner was not aware of this emigration. He believed that EAST and PGST would be on vacation with him in Venezuela beginning on August 1, 2018. On July 30, 2018, Petitioner texted Respondent asking what time he could pick up the Children the following day. Petitioner

---

[6] Petitioner avers that these documents were attached to the filing in order to show that Respondent was creating a portfolio of support for her political asylum application in the United States. Respondent claims that Petitioner attached these documents to the filing as a political attack and in order to gain political advantage against Respondent in the Venezuelan court.

became concerned when Respondent did not respond. By reviewing Respondent's, EAST's, and PGST's I-94's, Petitioner discovered that Respondent, EAST, and PGST had left the country. Petitioner notified the court in Venezuela that Respondent had left with the Children. The court contacted the Administrative Service of Identification, Migration, and External Relationship, which, through a letter dated October 29, 2018, confirmed that Respondent had left the country with the Children through Venezuela's Boca Del Grita Border Land Migratory Control Point, Tachira State. The agency attached to the letter a death certificate bearing Petitioner's name, which it said Respondent had used to exit the country.

On February 20, 2019, Petitioner filed the pending Petition under the Convention, asserting that Respondent wrongfully removed EAST and PGST from Venezuela and seeking EAST's and PGST's prompt return.

The Court held a bench trial on the matter that took place on July 30, July 31, August 6, and December 6, 2019. Prior to trial, the parties stipulated to the applicability of the Convention and also stipulated to the following facts: (1) EAST and PGST are under the age of sixteen; (2) EAST and PGST's habitual residence is Venezuela for the purposes of the Convention; (3) Petitioner had rights of custody, as contemplated by the Convention, under Venezuelan law at the time the Children were removed from Venezuela; (4) Petitioner was exercising rights of custody with respect to the minor Children at the time Respondent removed them from Venezuela; (5) Pursuant to the Hague Convention, Respondent wrongfully removed the Children from Venezuela and their retention in the United States is wrongful under Venezuelan law; and (6) Petitioner filed

his Petition for Return on February 20, 2019, which is within one year of the Children's removal from Venezuela. (Doc. No. 39 at 1-2).[7]

## EVIDENCE PRESENTED AT TRIAL

Each party was represented by counsel at the bench trial. Petitioner and Respondent presented many witnesses, including Petitioner and Respondent. Petitioner also called as a witness Jerman Escalona—as an expert witness with regard to Venezuelan law as well as a fact witness. Respondent called as witnesses William Rafael Medina, Ruben Dario La Rosa Deibis, Thomas Alzuru Vene, Angel Torres, Yobana Solano, and Maria Trinidad Solano Garcia. Mr. Medina, Dr. La Rosa, and Mr. Alzuru were offered as both expert witnesses and fact witnesses. Petitioner's and Respondent's respective accounts of their relationship and the conditions in Venezuela, as well as the testimony of their respective witnesses, differ greatly.

A.  Testimony of Respondent

Respondent testified that Petitioner was an aggressive person who abused her both physically and psychologically in front of EAST and PGST. According to Respondent, Petitioner was also physically abusive towards his son, Charbel in front of EAST and PGST. Respondent further testified to a small number of instances in which Petitioner allegedly abused EAST and PGST.

First, Respondent testified that she was physically abused by Petitioner three or four times during the course of their relationship prior to their first separation in 2014 but only provided details of one incident that occurred in 2013. In that incident, Respondent asserted that Petitioner

---

[7] As these points did not appear to be in legitimate dispute, they were tailor-made topics for stipulation, thus enabling the parties more court time and attention to focus on what was truly at issue in this case. Counsel, especially Respondent's counsel, is to be commended for reaching these stipulations and thus promoting litigative and judicial efficiency.

grabbed her by the hair and dragged her throughout the apartment. At the time, the Children were approximately one and two years old, respectively. Respondent testified that this incident happened in front of the Children, while one was crawling and the other was in his crib. Respondent submitted into evidence nine photographs of bruises and testified that they were caused by Petitioner. In the photographs, the Court discerns one bruise on each of Respondent's arms and also one bruise on Respondent's left knee.

Respondent also testified that Petitioner was psychologically abusive to her both during and after their relationship. According to Respondent, Petitioner was demeaning and would humiliate Respondent in front of the Children. As discussed above, Respondent filed a complaint in the court in Venezuela alleging psychological abuse. (Respondent Ex. 27).

Regarding the abuse of Petitioner's other son, Charbel, Respondent testified that when Charbel lived with Petitioner and Respondent (as well as EAST and PGST), Petitioner was physically aggressive towards Charbel. Specifically, Respondent stated that Petitioner would slap and squeeze Charbel in front of EAST and PGST.

Finally, Respondent testified about three situations she claimed to have witnessed in which Petitioner abused one of the Children. First, Respondent alleged that Petitioner would bite PGST on the buttocks when he was approximately eight or nine months old. Second, Respondent testified that on another occasion EAST was playing with a ball indoors and threw the ball at the television. According to Respondent, Petitioner responded by hitting EAST with a comb,[8] breaking it on EAST's leg causing bruising and difficulty walking. Respondent testified that this incident was one of the reasons she filed a complaint against Petitioner in 2014. The final incident that

_____

[8] Due to translation issues, the Court is not sure whether Respondent actually meant a comb or hairbrush.

Respondent testified to regarding Petitioner's alleged abuse of the Children occurred after Respondent had already removed the children to the United States and the Court had ordered Petitioner be granted access to the Children. (Doc. No. 16). On a Monday, allegedly, Petitioner returned the Children to Respondent's home after a visit. On Tuesday, Respondent's mother allegedly noticed a bump on PGST's forehead. Respondent and her mother did not take PGST to a doctor to examine the bump but did provide him acetaminophen. Respondent also testified that she filed a police report regarding the bump and that later a social worker visited the home.

Regarding conditions in Venezuela, Respondent testified that before she left with the Children, she had trouble obtaining certain vaccinations for them. Some were obtained through private means and the rest were obtained when they arrived in the United States. Currently, the Children are fully vaccinated. Respondent also testified briefly about the political conditions in Venezuela. In particular, Respondent testified that if someone is identified as being against the Maduro regime, they are charged with treason and penalized. Lastly, Respondent testified that on one occasion in 2011 or 2012, she, Petitioner, their maid, a female cousin, and EAST (as a newborn) were kidnapped for approximately six hours in their own home by people who were looking for money in Respondent and Petitioner's apartment. When the money was not found, Respondent (with EAST in her arms), Petitioner, and the female cousin were tied up. Respondent did not suggest that this incident was politically motivated.

B. Testimony of Petitioner

Predictably, Petitioner's testimony varies substantially from Respondent's testimony. Regarding the alleged 2013 incident in which Respondent alleged that Petitioner bruised her and pulled her hair, Petitioner testified that it simply did not happen. Petitioner further testified that when he plays with the Children they kiss, hug, and caress and that he did not bite PGST on the

bottom. Regarding the incident in 2014 during which Petitioner allegedly hit EAST in the leg with a comb, Petitioner recalled the incident but testified that it did not happen as Respondent claimed. According to Petitioner, one of the Children was going to throw a ball at the television, whereupon Respondent and Petitioner both stood up and screamed "no." This, according to Petitioner, startled the child, who began to cry. Petitioner did admit that he had a comb in his hand but denied that he hit either one of the Children with the comb.

During trial, Petitioner testified that be believed Respondent had been planning to seek asylum in the United States for many years. In support of this argument, he submitted an email from Respondent to Petitioner's then-lawyer on August 4, 2014. (Petitioner Ex. 8). In the email, Respondent asked Petitioner's lawyer how child support would work for underage children living outside of the country.[9] Petitioner also testified that in 2015, after Petitioner and Respondent had reconciled their relationship, they traveled to the United States for the purpose of speaking with Respondent's sister about the steps they would need to take in order to gain asylum in the United States.[10] Respondent's sister had obtained asylum in 2013. Petitioner testified that Respondent told him that in order to obtain asylum she needed to make complaints against Petitioner, ascribe to the opposition political party, post pictures on social media regarding her protests, talk badly about the government, and say that she was being persecuted.

Finally, Petitioner testified as to the current economic and political condition in Barquisimeto, Venezuela. According to Petitioner, grocery stores and restaurants are open, and he

---

[9] Respondent testified that the purpose of her question was to determine how child support would work if she and the Children resided in Lebanon with Petitioner's mother. According to Respondent, Petitioner suggested that Respondent and the Children would live in Lebanon and he would travel between Lebanon and Venezuela. Petitioner denies this.

[10] Respondent disputes that this meeting occurred.

can afford to shop at those stores and eat at those restaurants. In support of this, Petitioner submitted a video that he took of a grocery store approximately six minutes from him home on June 22, 2019. (Petitioner Ex. 33). The video shows Petitioner walking through a grocery store stocked with pasta, meats, cereals, Coca-Cola, milk, bottles of water, and so forth. Petitioner also submitted receipts for purchases of food on June 22, 2019 and June 24, 2019. (Petitioner Exs. 37 & 38). Petitioner testified that in Barquisimeto he has access to clean water; he purchases bottles of water for drinking but uses tap water for washing. Petitioner also testified that although the electricity goes off three or four times a week for a few hours a day, both he and Respondent have generators. When the power does go off, his generator powers the refrigerator, lights, and the television. Petitioner testified that he is able to obtain gas for his car and the generator. Petitioner also testified that he is able to obtain medication. Before the Children left, he testified, he had purchased acetaminophen and anti-allergy medication for them. According to Petitioner, in 2015 and 2016, EAST and PGST needed surgeries which required anesthesia; each surgery was successful. Finally, Petitioner testified that he is able to avoid any political demonstrations occurring in Barquisimeto.

C. Testimony of Other Witnesses

Multiple witnesses testified on behalf of Respondent during the trial on subjects ranging from the psychological well-being of the Children to the political, medical, and economic climate in Venezuela. Petitioner called one witness who testified both as a legal expert on Venezuelan law and as a fact witness on the conditions in Venezuela. Relevant testimony is outlined below.

Respondent's first witness, Ruben Dario La Rosa Deibis testified as an expert in psychology as well as a fact witness regarding conditions in Venezuela. Dr. La Rosa is EAST and PGST's psychologist. He has been seeing the Children since 2016. In Dr. La Rosa's expert opinion,

EAST and PGST are suffering from anxiety and have been exhibiting aggressive behavior as a result of the tumultuous relationship of their parents. As a fact witness, Dr. La Rosa testified that he and his family left Venezuela and moved to Mexico City in May 2019 due to shortages of food, difficulty obtaining medicine, and problems with running water in their home. According to Dr. La Rosa, prior to leaving Venezuela his family went nearly a month without propane gas for cooking. He testified as to the problems with electricity, including an outage that lasted five days. Finally, Dr. La Rosa testified that he has seen and treated individuals who were incarcerated and tortured by the security forces of the government of Nicolas Maduro.[11]

Respondent's next witness, Thomas Alzuru Vene is a judge of the Supreme Court of Justice in Venezuela living in exile in the United States. Since Mr. Alzuru came to the United States in 2017, he has been assisting Venezuelans prepare their asylum claims. Mr. Alzuru testified that four million Venezuelans have fled the country. Mr. Alzuru also testified that there is corruption in the legal system in Venezuela.

Respondent's third witness, Angel Eduardo Torres Morillo is a representative of the state of Lara in the National Assembly of Venezuela. As part of his job, Mr. Torres testified, he has had the opportunity to travel around the state of Lara and observe the living conditions. He characterized the situation in the state of Lara as a complete humanitarian crisis. Mr. Torres discussed the minimum wage in Venezuela compared to the prices for milk, eggs, and meat. According to Mr. Torres, as of July 31, 2019, the weekly minimum wage was 48,000 bolivars, a kilo of milk was 50,000 bolivars, a carton of eggs was 40,000 bolivars, and a kilo of meat was

---

[11] The Court takes judicial notice of the fact that Maduro has held the position of President of Venezuela since 2013, although Juan Guaido, President of the National Assembly of Venezuela, has made a competing claim to the presidency—recognized as valid by the government of the United States and dozens of other countries—since January 2019.

between 35,000 and 40,000 bolivars.[12] Finally, Mr. Torres testified about the political unrest in Venezuela, including the persecution of political opposition leaders.

Maria Solano, Respondent's mother, also was called to testify by Respondent. Ms. Solano currently resides with Respondent, EAST, PGST, and Respondent's sister. Ms. Solano testified about her above-described observation of a bump on PGST's forehead the day after Petitioner had visited EAST and PGST.

Both parties called as witnesses their respective attorneys representing Petitioner and Respondent in the pending actions in Venezuela. Jerman Escalona represents Petitioner and William Rafael Medina represents Respondent. Prior to the testimony of Mr. Medina and Mr. Escalona, the parties stipulated that both gentlemen are experts in Venezuelan law.

Mr. Medina, Respondent's Venezuelan attorney, testified that the proceedings in Venezuela have been biased against Respondent. However, Mr. Medina also testified that the courts in Venezuela are open, he has been able to file documents in the courts, he has been able to review the case files, the Venezuelan court has issued decisions in Respondent's favor, and he does have other clients that are receiving fair trials in Venezuela.

Mr. Escalona, Petitioner's Venezuelan attorney, testified in detail as to the procedural history and disposition of the cases between Petitioner and Respondent in Venezuela. According to Mr. Escalona, some decisions have been rendered in favor of Petitioner and some in favor of Respondent. Mr. Escalona also testified that there are laws that protect women and children from violence in Venezuela. He explained that when a woman files a claim of violence against a man,

---

[12] Based on its own research, the Court has reason to believe that the minimum wage in Venezuela has increased since that time. *See* Alex Vasquez, *Venezuela's Maduro Hikes Minimum Wage Again, This Time by 275%*, BLOOMBERG (October 14, 2019, 12:28 PM), https://www.bloomberg.com/news/articles/2019-10-14/venezuela-s-maduro-hikes-minimum-wage-again-this-time-by-275.

automatic measures of protection and security go into effect; these provisions prevent the man from being within a certain proximity of the woman, communicating with the woman, harassing the woman, and following the woman. This, according to Mr. Escalona, occurred when Respondent filed the psychological complaint against Petitioner in late 2017 into early 2018. Mr. Escalona also testified that there is a law that protects children, guaranteeing their physical and mental security, and that there are district attorneys that are employed specifically to protect children from parents, relatives, or third-parties.

## FINDINGS OF FACT[13]

Petitioner and Respondent have provided directly conflicting testimony regarding their relationship with each other and Petitioner's relationship with all of his children. Based on its observations during the hearing and its review of the evidence, the Court affirmatively finds the following facts: (1) Respondent used a fraudulent death certificate in order to leave Venezuela with the Children; (2) Petitioner perpetrated some physical act against Respondent, causing her injury, in approximately 2013; (3) Petitioner and Respondent have a tumultuous relationship that negatively affects EAST and PGST; and (4) Petitioner would be able to provide shelter, food, and medication for EAST and PGST in Venezuela. There are also events and facts alleged by Respondent that the Court is unable to find, including (1) Petitioner's physical abuse of Respondent on the two or three occasions besides the incident in 2013; (2) Petitioner's physical or emotional abuse of the Children, and (3) Petitioner's abuse of Charbel in front of the Children. Regarding the remaining facts posited by both parties, the Court cannot draw a conclusion either

---

[13] The uncontested facts set forth in the Background Section are hereby incorporated into the Court's findings of fact.

way because it does not find either party's version of the events to be more credible than the other party's.

First, the Court finds that Respondent used a false death certificate bearing Petitioner's name to exit the country with EAST and PGST. Petitioner testified that upon notifying the court in Venezuela that Respondent, EAST, and PGST left the country, the Administrative Service of Identification, Migration, and External Relationships sent him a letter stating that Respondent was able to exit the country with the Children by presenting a death certificate bearing Petitioner's name at the country's border. Petitioner submitted into evidence a copy of this letter as well as a copy of the fraudulent death certificate. (Petitioner Ex. 27). Although Respondent testified that she has never seen the document before, she did not otherwise question the authenticity of the letter or death certificate as she did of another exhibit introduced at trial. Based on its review, the Court believes that the letter and fraudulent death certificate submitted by Petitioner are authentic in the sense that Petitioner did in fact receive the letter and death certificate from the administrative agency. Furthermore, that Respondent did in fact use this document to exit Venezuela is corroborated by her successful emigration from Venezuela to the United States with the Children. During trial, Petitioner's expert witness, Jerman Escalona, testified that (under Venezuelan law) when one parent wishes to leave the county with minor children he or she must either (1) have the permission of the other parent; (2) have travel authorization issued by a court or judge; (3) submit proof that he or she has sole custody of the children; or (4) submit a death certificate of the other parent. The fact that Respondent was able to leave the country with the Children suggests that she must have satisfied one of these four conditions. And because Respondent did not have permission from Petitioner, travel authorization from a court or judge, or proof of sole custody, the Court finds

that the death certificate entered into evidence (or a copy of the same) was in fact used by Respondent to exit Venezuela with EAST and PGST.

Furthermore, the Court finds that Respondent's use of a fake death certificate reflects negatively on her credibility. Respondent has demonstrated that she is willing to falsify a Venezuelan government document in order to achieve her objective of residing in the United States with the Children. Although this does not necessarily mean that she would risk falsifying her testimony in United States District Court, it does show that she is highly motivated to achieve her objective, including by falsely portraying Petitioner—for example, as dead rather than alive—in order to do so. This reality, while not dispositive of every credibility battle with Petitioner, means that Respondent lacks the reserves of inherent credibility that could help her in those battles. The Court must keep this is mind. And accordingly, where Respondent has provided uncorroborated testimony that conflicts directly with the testimony of other witnesses or exhibits presented at trial, the Court will consider Respondent's motives and prior actions relating to her migration.[14]

Second, regarding Respondent's allegation that Petitioner physically abused her on three or four occasions, the Court finds that Respondent has provided sufficient evidence to establish only that something happened between Petitioner and Respondent on one occasion in 2013. However, the Court does not have enough context to determine exactly what happened. Respondent testified that Petitioner grabbed her by the hair and dragged her throughout the apartment. Respondent submitted nine photographs of bruises into evidence and testified that they

---

[14] This is not to say that the Court is applying a blanket rejection of Respondent's testimony. Rather, it is just a factor the Court has considered in making its factual determinations. And of course the Court must and does keep in mind that Petitioner's motives must be also be considered when weighing his testimony. But the Court simply has not been presented with specific evidence that Petitioner will go to the same lengths, in terms of stark and risky misrepresentations to government officials, to achieve his objectives.

were caused by Petitioner. In the photographs, the Court can see one bruise on each of Respondent's arms and one bruise on Respondent's left knee. But Respondent did not testify how being dragged through her apartment caused these bruises (i.e. hitting, grabbing, squeezing, or crashing into objects) and the Court will not speculate. Although the photographs do not explain what happened, the Court does find that they are evidence that something happened.[15]

In addition to the photographs, Respondent testified that she filed a complaint with the Venezuelan court in response to the physical violence. Although Respondent did not submit the complaint as evidence, Petitioner did not contest the fact that such a complaint or report was in fact filed. The Court does note that while discussing the alleged incidents of *physical abuse* towards Respondent during direct examination, Respondent's counsel elicited testimony from Respondent that she did seek help from the Court system, referencing Respondent Exhibit 27. However, Respondent Exhibit 27 is a complaint filed by Respondent in 2017 alleging *psychological violence* and has nothing to do with any of the three or four alleged incidents of physical abuse. Despite the dearth of evidentiary support, the Court finds that the fact that Respondent filed a complaint of some sort in response to the alleged incident also supports the notion that something occurred between Petitioner and Respondent in 2013.

Although the Court finds that something happened between Petitioner and Respondent on one occasion in 2013, Respondent's vague reference to other incidents of violence is insufficient to establish that these additional incidents of abuse occurred. Respondent did not testify what, when, or where the alleged abuse occurred. The Court simply does not have enough context to determine what, if anything, happened on these two or three other occasions.

---

[15] Petitioner's uncorroborated testimony that he did not do anything to cause these bruises without further explanation does not weigh heavily against Respondent's allegation that something happened.

Third, the Court finds that Petitioner and Respondent often argue and treat each other badly in front of EAST and PGST. In support of this finding, the Court relies upon testimony from Dr. La Rosa, the Children's psychologist. In his report, Dr. La Rosa stated that he was told by EAST that he witnessed his parents argue and that his father treats his mother badly and his mother treats his father badly. Based on a psychological evaluation, Dr. La Rosa concluded that both EAST and PGST have adequate development for their ages but suffer from high levels of anxiety and aggressiveness due to experiencing their parents' separation and witnessing their parents fighting.[16] Respondent classifies some of this fighting as verbal abuse. Although the Court finds that this classification is an accurate description of the parties' interactions, it does not find that the verbal abuse was as one-sided as Respondent suggests. Respondent testified that Petitioner was demeaning and his treatment of her was humiliating. Specifically, Respondent testified that on more than one occasion Petitioner told her that if she was unhappy, she could hang herself with a rope from the balcony of their ninth floor apartment. Petitioner did not deny or contest this testimony. But Respondent is no shrinking violet; if the trial established anything, it is that she is more than able to stick up for herself and take bold and prompt action to protect herself and her

---

[16] The Court cannot find that Petitioner told the Children directly that he was going to put their mother in jail. On this point, there is too much conflicting testimony. Respondent testified that she filed a claim of psychological violence in January 2018 because Petitioner started telling the Children that he was going to put Respondent in jail. Petitioner testified that it was Respondent who told the Children that Petitioner was going to put her in jail. Dr. La Rosa testified both that EAST told him that EAST overheard Petitioner say to Respondent that he would put her in jail and that Petitioner would tell the Children that he was going to put their mother in jail; this testimony primarily supports Respondent's version rather than Petitioner's version, but it is based on EAST's alleged hearsay statement, to which the Court can ascribe relatively little weight. The Court does not find any witness's testimony more credible than the others.

perceived interests. And, based on various testimony and exhibits, the Court has reason to believe that Respondent said unkind things to Petitioner as well.[17]

Fourth, the Court finds that Petitioner would be able to provide shelter, food, and medications for EAST and PGST in Venezuela. Although Respondent's witnesses testified that there is a shortage of food in Venezuela, Petitioner provided video evidence of a grocery store close to Petitioner's home full of food and water. Furthermore, Respondent's witnesses did not have any personal knowledge regarding Petitioner's ability to obtain such necessities, which Petitioner was able to demonstrate through testimony regarding his employment, receipts of recent grocery purchases, and Respondent's admission that Petitioner provided the Children with food when they were in Respondent's care before they left Venezuela.

The Court is also satisfied that the Children would have adequate shelter upon their return to Venezuela. If Respondent chooses to return to Venezuela with the Children, they will all be able to reside in the house that she owns in Barquisimeto. After Respondent left Venezuela, Petitioner initiated a stable union case in which the Venezuelan court has granted Petitioner preliminary custody of Respondent's home. Therefore, Respondent has been unable to sell it. If Respondent chooses not to return to Venezuela with the Children, the Court is satisfied that Respondent has adequate income and family in Venezuela to provide the Children with adequate shelter.

Finally, the Court is satisfied that Petitioner would be able to provide EAST and PGST with adequate medical care. Because Respondent confirmed that EAST and PGST are fully

---

[17] For example, in a handwritten letter from Respondent to Petitioner dated January 7, 2016, Respondent admitted that the deterioration of their relationship was due not only to Petitioner's mistakes but also due to things that Respondent did wrong, including something done to lose Petitioner's trust. (Petitioner Ex. 27 (". . . if you leave I want to thank you for all the good times we lived together, forgive the things I did wrong, perhaps my short age and spoiled attitude prevented me from knowing how to have a good and healthy relationship . . . ")).

vaccinated, whether vaccinations are in short supply in Venezuela is irrelevant to this case (except insofar as the issue might reflect tangentially on the conditions in Venezuela in general). Moreover, the Court is aware that Petitioner himself was recently required to obtain medical attention and was able to do so. And although Respondent's witness, Dr. La Rosa, testified that more than half of the professionals who were employed in his building have left, Respondent has provided no evidence that Petitioner is not able to obtain sufficient medical care from the professionals who remain in Venezuela.

In support of her Article 13 defense, which the Court discusses below, Respondent relies upon additional alleged facts that the Court cannot credit, because the allegations are supported only by testimony that is uncorroborated and in direct conflict with the testimony of Petitioner or other witnesses. Most notably, the Court does not find that Petitioner abused EAST and PGST. Respondent testified that Petitioner physically abused the Children on three separate occasions, but none were corroborated by credible evidence.

First, regarding the incident in which Petitioner allegedly hit EAST on the leg with a comb, Petitioner and Respondent disagree as to whether Petitioner hit EAST at all. Although both agree that there was an occasion in which EAST threw a ball at a television in their apartment, Petitioner asserts that both parents merely yelled at EAST while Respondent insists that Petitioner hit EAST with such force that the comb broke on his leg. Respondent has not provided evidence corroborating her version of the story.[18] The Court finds that this this uncorroborated, disputed

---

[18] Moreover, during a hearing on March 19, 2018, Charbel testified that although he was not in the room when the alleged incident happened, he did not see his father hit EAST and did not see EAST with a bruise on his leg. He testified that EAST had never been bruised by something his father had done. (Doc. No. 29 at 64-65). This testimony does not directly contradict Respondent's version of this incident, but it does highlight the absence of corroboration for Respondent's version.

testimony is not clear or convincing, and therefore cannot be relied upon by Respondent in support of her Article 13 defense.

Second, Respondent testified that Petitioner would bite PGST on the buttocks when he was approximately eight or nine months old and make him cry. Petitioner contested that this ever happened. Respondent testified that she never had to take PGST to the hospital or doctor regarding these bites. Further, Respondent maintained that Petitioner saw it as a game, but she did not. During the March 19, 2019 Hearing, Respondent characterized this biting as "part of playing with them." (Doc. No. 29 Tr. 29:13-15). Respondent has not provided evidence sufficient to show Petitioner abused PGST by biting him on the buttocks.

Finally, Respondent testified that she and her mother discovered a bump on PGST's forehead the day after the Children had visited with Petitioner. Respondent provided no evidence that Petitioner caused the bump aside from the fact that it was discovered the day after Petitioner had visited with the Children. Indeed, this allegation is far too vague to permit the Court to infer any connection between the bump and Petitioner. Further, although Respondent testified that she filed a police report regarding the bump and later a social worker visited the home, she did not submit a police report or documentation relating to a social worker. Respondent did not testify that there was any bruising on PGST's forehead or other injuries elsewhere on his body. Accordingly, the Court will not infer that Petitioner caused this bump or classify this allegation as abuse.

Finally, the Court also cannot find that Petitioner was abusive towards Charbel. The only evidence of any violence towards Charbel was Respondent's own testimony, which Charbel disputed during the March 19, 2019 Hearing. (Doc. No. 46). There was no other evidence provided at trial, either through witness testimony, physical evidence, or documentary evidence such as text messages or a police report, that tends to corroborate Respondent's testimony. This

uncorroborated, hotly disputed testimony is simply insufficient to support her allegation that Petitioner was abusive towards Charbel. In addition, Respondent testified that a number of these incidents (even if true) did not take place in front of EAST or PGST.

## CONCLUSIONS OF LAW

### I. The Convention

In 1980, at the Hague Conference on Private International Law, twenty-nine states ("Contracting States") convened and enacted the Hague Convention in order to accomplish the following objectives: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State"; and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Convention, art. 1. The United States and Venezuela are both signatories to the Hague Convention. Congress ratified and implemented the Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. The Convention and ICARA seek to "preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (hereinafter "*Friedrich I*") (citation omitted).

This Court "has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996) (hereinafter "*Friedrich II*") (citing Convention, Article 19). The issue before the court is whether a child has been wrongfully removed from his or her habitual residence and, if so, whether one of four narrow exceptions apply. *Whallon v. Lynn*, 230 F.3d 450, 454-55 (1st Cir. 2000). Article 3 of the Convention defines wrongful removal or retention as follows:

The removal or the retention of a child is to be considered wrongful where—

(a) [the retention of the child] is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention art. 3. If the petitioner is able to successfully establish a prima facie case of wrongful removal, the court must determine whether the respondent has established that any of the Hague Convention's affirmative defenses apply. *See* 22 U.S.C.A. § 9003(e)(2); *Friedrich II*, 78 F.3d at 1067. These affirmative defenses are as follows: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that the return of the child would expose them to physical or psychological harm or would otherwise place the child in an intolerable situation; and (4) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *See* Convention, arts. 12, 13(a)–(b), 20; 22 U.S.C.A. § 9003(e)(2)(A)–(B). The Sixth Circuit has stressed that the exceptions are to be interpreted narrowly. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). If the Court determines that the removal was wrongful, and that no exception applies, then the Court "shall order the return of the child forthwith." Convention, art. 12.

## II. Evidentiary Issue

After trial concluded, the Court permitted the parties to file documents supporting or challenging (1) the accuracy of Respondent's testimony that she filed a police report against Petitioner in 2016 ("2016 Police Report") because Petitioner had allegedly installed a GPS in her vehicle without her knowledge and (2) the authenticity of two letters submitted as evidence by Petitioner (Petitioner Ex. 70) related to the challenged testimony. Although the 2016 Police Report

was produced to Petitioner during discovery, Respondent (and, for that matter, Petitioner) did not offer the report into evidence during trial. Respondent did submit as evidence a photograph of the GPS that was attached to the police report. (Respondent Ex. 33).

During Petitioner's case-in-chief, he testified that he had no knowledge of the 2016 Police Report prior to receiving Respondent's discovery responses. According to Petitioner, he had not been notified of the 2016 Police Report (as he had of other complaints Respondent filed against him) and therefore questioned its authenticity. As a result, he testified, he went to the police station in Venezuela to inquire as to why he had not been notified that this report had been filed against him. Petitioner further testified that at the police station, he provided the officers with (1) a letter requesting that the police inform him why he was not notified that the 2016 Police Report (complaint No. 187-16) had been filed against him and (2) a copy of the 2016 Police Report (complaint No. 187-16) that he received during discovery.

In response to his inquiry, Petitioner received two letters—one dated October 23, 2019 from Jose Gregorio Rojas Eugenio the Director General of Police, Lara State, and the other dated October 21, 2019 from the Commissioner Anderson Rafael Melendez Mujica, Director of Center of Police Coordination. (Petitioner Ex. 70). According to Petitioner, the letters state that complaint No. 187-16 was not filed by Respondent against Petitioner but rather corresponds to a complaint filed by a citizen named Alix Teresa Valasco Pena. (Doc. No. 50-2 at 3).[19]

---

[19] During trial, Respondent's counsel objected to the introduction of these letters into evidence on the grounds that the document was not produced to Respondent in accordance with the Court's scheduling order and, had he been given proper notice of the documents, he would have procured witnesses to testify that the letters themselves were fraudulent. In response, counsel for Petitioner asserted that the letters were new evidence—in that Petitioner received these documents when he went back to Venezuela after the third day of trial in early August—and that she provided the letters to Respondent's counsel as soon as she received them. Because the Court was concerned that one of the parties had submitted inauthentic documents or falsified a Venezuelan Police

In support of her argument that the 2016 Police Report (complaint No. 187-16) was authentic and that the two letters entered into evidence by Petitioner (Petitioner Ex. 70) were inauthentic, Respondent filed a statement (and an unsworn translation of the same) by Irumary Elianna Lucena Gutierrez, the police officer who, while on duty at the Fundalara Coordination Police Center, purportedly took the complaint of Petitioner and signed the 2016 Police Report. (Doc. No. 49). Ms. Gutierrez avers that she took the complaint of Respondent with case No. 187-16 and, as a result, is being investigated by the "Inspector for Control of Police Actions and Investigation of the Police Deviations." (*Id.*) Ms. Gutierrez asserts that because of the investigation, she has been removed from her job and sent to work in a different division with no further explanation. Ms. Gutierrez also states that the Director of the Police Corps (Jose Gregorio Rojas Eugenio) is a Brigadier General of the High Military Command and was appointed by the Lara State Governor, apparently implying that Petitioner has conspired with corrupt officials of the Maduro regime. Ms. Gutierrez signed the statement "Elianna Lucena" with two fingerprints and attached her Identity Card, Official Credentials, and Proof of Work Letter. (*Id.*)

On January 31, 2020, after the deadline for submitting post-trial filings had passed, Respondent filed pro se additional documents that she contends show "events [that] are part of an ongoing threat that happened after the deadline to submit." (Doc. No. 55 at 1). Because the Court, absent the most extraordinary of circumstances, does not accept pro se filings, it directed Respondent's counsel to advise as to whether they intended to adopt Respondent's filings as their own. (Doc. No. 57). Counsel for Respondent declined to adopt them. (Doc. No. 58). Accordingly, the Court will not consider the documents submitted in Respondent's pro se filing.

---

Report, the parties were permitted to submit post-trial filings providing further information to the Court.

In response to Respondent's authorized post-trial filings, Petitioner filed: (1) a Notice of Objection to the Admissibility of Documents filed by Respondent; (2) a Notice of Filing Signature Page of Irumary Elianna Lucena Guiterrez's Statement; (3) the Signature Page of the 2016 Police Report; and (4) Summons for Pierre Salame Ajami. (Doc. No. 53). In particular, Petitioner objects to the admissibility of the statement of Irumary Elianna Lucena Gutierrez (and the uncertified translation of it offered by Respondent), which he contends has not adequately been authenticated. Petitioner challenges the authenticity of the statement on two grounds. First, he notes that although the statement is signed, it is unsworn, neither being notarized nor containing the language prescribed for sworn declarations under 28 U.S.C. § 1746. Second, Petitioner asserts that the signature of Ms. Gutierrez on her statement (Doc. No. 53 Ex. 1) differs significantly from the signature on the last page of the 2016 Police Report (Doc. No. 53 Ex. 2).

After reviewing the parties' post-trial filings, the Court finds that Respondent simply has not submitted evidence sufficient to support her testimony that she did in fact file the 2016 Police Report bearing complaint No. 187-16 or her theory of a conspiracy between Petitioner and Venezuelan officials. The only support Respondent has provided is the signed statement of Ms. Gutierrez. This statement is not persuasive for a number of reasons. First, as Petitioner points out, this statement does not qualify as a sworn statement, and no certified translation of it has been submitted. Second, the substance of the statement (assuming arguendo the accuracy of the uncertified translation) raises various questions. Although Ms. Gutierrez attests that she did take complaint No. 187-16 and that it was from Respondent, she does not state the basis for her knowledge that the complaint was numbered 187-16. According to Ms. Gutierrez, she has been removed from her job with the Venezuelan police. The Court will not assume that she has, since her removal, had access to the complaints taken at the Fundalara Coordination Police Center where

she was employed at the time of the purported complaint. Thus, the question is squarely raised how she would even know the number of the complaint at issue, or that such number corresponds to the particular complaint to which respondent claims it corresponds. The Court will not assume that Ms. Gutierrez can remember the number, and corresponding subject matter of each complaint she took during her thirteen years of service, and she sets forth no basis for remembering such data in this particular instance.

In addition, Ms. Gutierrez's statement vaguely suggests that complaint No. 187-16 may be attributed to another citizen because complaints related to gender violence have nothing to do with numbers related to complaints for common crimes and because the director of this police force, Jose Gregorio Rojas Eugenio, was appointed by the Lara State Governor and both the director and governor support the National Government.[20] The Court is unpersuaded by this explanation because, according to Petitioner's filings, complaint No. 187-16 filed by Alix Teresa Velasco Pena is also alleged to be a complaint regarding gender-based violence. (Doc. No. 50-2). Thus, this complaint presumably would be subject to the same numbering system as Respondent's purported complaint No. 187-16; therefore, if this complaint bears No. 187-16 then Respondent's would not. And in any event, Ms. Gutierrez's suggestion fails to provide evidence, as opposed to speculation, of a legitimate reason why complaint No. 187-16 has been reported to be a complaint filed by another citizen and not Respondent. Finally, the Court has concerns with the various signatures of Ms. Gutierrez. Not only does the handwriting appear to be different between Ms. Gutierrez' signature on her statement and her signature on the 2016 Police Report, but the signatures also

---

[20] The Court does not suggest that such a conspiracy is not possible. However, Respondent has not provided evidence sufficient to support this theory.

seem to use different names. (*Compare* Doc. No. 53-1 (Lucena Eliana) *with* Doc. No. 53-2 (Oficial [illegible] Irumary)).[21]

Petitioner's filings, on the other hand, are far more extensive. In order to show that the 2016 Police Report (complaint No. 187-16) was inauthentic and that the two letters entered into evidence by Petitioner (Petitioner Ex. 70) were authentic, Petitioner filed the following: (1) the Request for Judicial Inspection filed by Jerman Escalona on behalf of Petitioner (Doc. No. 50-1); (2) the certified results of the judicial inspection (December 16, 2019 Judicial Inspection Report) (Doc. No. 50-2); (3) the Affidavit of Anderson Rafael Melendez Mujica (Doc. No. 51-1); (4) the Affidavit of Petitioner, Pierre Salame Ajami (Doc. No. 51-2); (5) a decree issued in the Bolivarian Republic of Venezuela Lara State Official Gazette, dated August 30, 2019, demonstrating that Jose Gregorio Rojas Eugenio was appointed to the position of Director General in Charge of Lara State Independent Institute of Police Force (Doc. No. 52-1); and (6) a Lara State Government Publication dated August, 31, 2019, reporting that the governor of Lara State, Carmen Melendez, appointed Major General Jose Gregorio Rojas Eugenio to the position of Commander of the Independent Institute of the Lara State Police Force (Doc. No. 52-2).

The Court finds Petitioner's filings more persuasive. First, Petitioner filed a significant number of documents from various people involved in the judicial inspection of complaint No. 187-16 (Doc. Nos. 50-52), contrasting Respondent's single statement. Second, Petitioner supported these filings with evidence confirming the identities and demonstrating the authority of the officials who authored the two letters at issue. (Doc. Nos. 51 & 52). Third, each of Petitioner's filings are signed by the person making the declaration or affidavit and stamped and witnessed by

---

[21] The Court also notes that the signatures of Ms. Gutierrez on her signed statement and the 2016 Police Report also differ from the signature on her identification card. (Doc. No. 49-1).

a Venezuelan official. Finally, each of Petitioner's translations are certified, being sworn to and stamped.

Accordingly, the Court finds that Respondent has failed to provide evidence sufficient to support the testimony she provided at trial regarding her filing the 2016 Police Report. Nor has Respondent provided evidence demonstrating that Petitioner has conspired with corrupt officials to cover up the 2016 Police Report.[22] Rather, the Court finds that Petitioner has provided sufficient evidence demonstrating that the letters he received from the Venezuelan officials (Petitioner Ex. 70)—stating that the police report with complaint No. 187-16 was not filed by Respondent against Petitioner—are authentic. This further suggests that the 2016 Police Report provided to Petitioner during discovery but not submitted as evidence during trial likely was a falsified Venezuelan Police Report and that Respondent testified inaccurately during the trial. The resolution of this evidentiary issue, like that of the false death certificate, reflects negatively upon Respondent's credibility. And although the Court does not apply a blanket rejection of Respondent's testimony, where Respondent has provided uncorroborated testimony that conflicts directly with the testimony of other witnesses or exhibits presented at trial, the Court bears in mind its resolution of credibility issues against Respondent.

### III. Respondent's Statutory Defenses

The parties in this action have stipulated that all of the elements of Petitioner's prima facie case have been satisfied.[23] Therefore, the only issue before the Court is Respondent's affirmative

---

[22] The Court does not mean to suggest that such a cover-up by Venezuelan authorities is impossible or even especially implausible; the Court means only that it has not been shown to have occurred here.

[23] As indicated above, the Court commends Respondent's counsel for so stipulating. The Court also notes that although such stipulations ostensibly were for the benefit of Petitioner, they actually

defense(s) pursuant to Article 13(b) of the Hague Convention.[24] Article 13(b) requires that Respondent demonstrate by clear and convincing evidence that returning the Children "would expose the child[ren] to physical or physiological harm or otherwise place the child[ren] in an intolerable situation." Convention, art. 13(b). The Sixth Circuit has elaborated as follows:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich II*, 78 F.3d at 1069. Although the difference between "physical or psychological harm" and an "intolerable situation" is not entirely clear,[25] there is a difference. In *Pliego v. Hayes*, 843 F.3d 226 (6th Cir. 2016), the Sixth Circuit stated that "[t]he ordinary meaning of 'expose the child to physical or psychological harm or otherwise place the child in an intolerable situation' suggests that an 'intolerable situation' must be different from 'physical or psychological harm,' but nevertheless serious." *Id.* at 233. In reaching this conclusion, the Court focused on the plain meaning of the word "otherwise," defined as "'in a different way or manner,' 'in different circumstances,' or 'in other respects.'" *Id.* (citing Webster's Third New International Dictionary

---

also aided Respondent by enabling the Court to grant more trial time, and devote more attention, specifically to Respondent's defenses.

[24] The parties agreed to strike Respondent's affirmative defense asserted under Article 20. (*See* Doc. No. 44). The Court's comments in the footnote immediately above are applicable also to Respondent's prudent choice to eschew a shotgun approach to this case and instead focus on its best defenses and the issues truly in dispute.

[25]*Compare Pliego*, 843 F.3d at 232 ("[T]he few cases that do discuss an "intolerable situation" focus on "sexual[ ] abuse" and the "civil stability" of the child's country of habitual residence, rather than the ability of foreign courts to adjudicate the dispute.") *with Simcox*, 511 F.3d at 607-08 ("[A]t the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect.")

1598 (2002)). The upshot is that a respondent can establish a defense under Article 13(b) by showing *either* that there is a "grave risk that [the child's] return would expose the child to physical or psychological harm" *or* that returning the child(ren) would in some other sense place the child(ren) in an intolerable situation.

The first alternative by its terms requires only that the risk be grave and the harm be physical or psychological. Convention, art. 13(b). For this defense to apply, "[t]he person opposing the child's return must show that the risk to the child is grave, not merely serious." *Friedrich II*, 78 F.3d at 1068 (citing Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)). The Sixth Circuit has also held that the harm must be "a great deal more than minimal." *Simcox*, 511 F.3d at 605 (citing *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). The applicable verbal standards here are subjective, and the line between "serious" and "grave" (and between "a great deal more than minimal" and "not-quite-a-great-deal more than minimal") is a matter of opinion, and perhaps also semantics. Nevertheless, despite the ambiguity in these terms, it falls to this Court to construe and apply them here as reasonably and faithfully as possible. In other words, under the first prong, Respondent must show, by clear and convincing evidence, that if the Children are sent back to Venezuela there is a grave risk that the Children would suffer severe physical or psychological harm.

The second alternative—is likewise amorphous. The Sixth Circuit has stated that an "[intolerable situation] must mean something serious: either it cannot be borne or endured, or it fails some minimum standard of acceptability." *Pliego*, 843 F.3d at 233. Again, the applicable terms are subjective: "serious," "endur[able]," and "minimum." What is "serious" to one person may not be "serious" to another, and what one person finds endurable another may not find

endurable. This naturally poses problems for the construction and application of the applicable standard of this alternative defense, as with the prior alternative defense.

Helpfully, however, Sixth Circuit has provided some examples of what it considers an intolerable situation. In *Pliego*, the Sixth Circuit held that the practical or legal inability of courts in the state of habitual residence to adjudicate could constitute an intolerable situation in light of the Convention's purpose: allowing the state of habitual residence to adjudicate custody. *Id.* at 232-33. In *Friedrich II*, the Sixth Circuit provided as an example of an intolerable situation one in which a custodial parent sexually abuses the child. *Friedrich II*, 78 F.3d at 1069. The Sixth Circuit has also suggested that the "civil stability" of the state of habitual residence could be considered under the intolerable situation standard. *See Pliego*, 843 F.3d at 228-29. However, "'intolerable situation' was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State." *Friedrich II*, 78 F.3d at 1068-69.

Respondent has presented theories under both alternatives of the Article 13(b) defense. First, Respondent avers that EAST and PGST should not be returned to Venezuela because there is a grave risk that doing so would expose them to physical and psychological harm as demonstrated by Petitioner's prior words and violent actions towards Respondent, Charbel, and the Children. Second, Respondent argues that: (1) civil and economic instability, and poor living conditions, in Venezuela; and (2) corruption within the Venezuelan courts, which (according to Respondent) prevents them from being able to adjudicate the parties' custody dispute, would subject EAST and PGST to an intolerable situation. But for the reasons discussed below, the Court finds that Respondent has not presented clear and convincing evidence demonstrating that there is

a grave risk that returning EAST and PGST to Venezuela would expose them to physical or psychological harm or otherwise place them in an intolerable situation.

    A.  Grave Risk of Physical or Psychological Harm

Respondent argues that EAST and PGST should not be returned to Venezuela because there is a grave risk that returning EAST and PGST would expose them to physical and psychological abuse at the hands of the Petitioner. "Where allegations are made concerning physical abuse, it is axiomatic that the purposes of the Hague Convention are not furthered 'by forcing the return of children who were the direct or indirect victims of domestic violence.'" *Foster v. Foster*, 654 F. Supp. 2d 348, 351 (W.D. Pa. 2009) (quoting *Simcox*, 511 F.3d at 604). In *Simcox*, the Sixth Circuit considered what level of domestic abuse warrants denial of a petition under the grave-risk-of-harm exception. *Simcox*, 511 F.3d at 605. The court delineated three broad categories of abusive situations: "First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a 'grave risk' or otherwise place the child in an 'intolerable situation' under Article 13b." *Id.* at 607.[26] On the other hand, the second type of cases involve abuse "in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607-08. The final type of cases "fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable." *Id.* at 608. A determination of the category of abuse requires "a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the

---

[26] It bears mentioning that the Sixth Circuit is not saying that abuse is perfectly fine as long as it is "relatively minor" and not "intolerable." The Sixth Circuit is merely saying that it is not a defense to the child[ren]'s return under Article 13(b)—which in turn means that any abuse can (and, under the Hague Convention, must) be dealt with by courts (or other authorities) in the country of return, not in the United States.

likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.*

Upon review, the Court finds that Respondent has not proven by clear and convincing evidence that returning EAST and PGST to Venezuela "would expose the child[ren] to physical or psychological harm . . ." Hague Convention, art 13(b). As discussed above, the Court finds that Respondent has established only one incident of physical abuse by Petitioner towards Respondent in 2013. And the Court finds that this sole incident is insufficient to demonstrate that returning EAST and PGST to Venezuela would expose them to a grave risk of harm. As an initial matter, Respondent did not establish that Petitioner ever threatened or abused *the Children*. *See Guevara v. Soto*, 180 F. Supp. 3d 517, 533 (E.D. Tenn. 2016) (finding that the defendant did not meet her burden to prove grave risk of harm to the child because "[w]hile defendant submits that plaintiff had an alcohol problem and abused her in the past, she does not allege that plaintiff abused the child."). "To prevail on an Article 13(b) defense, there must be evidence of a grave risk of harm to each child, not solely to a parent or some other third party." *Acosta v. Acosta*, No. 12-cv-342, 2012 WL 2178982, at *7 (D. Minn. June 14, 2012) (citing Convention art. 13(b)); *see also Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010) ("The relevant inquiry is not whether there would be a grave risk of harm to [the child's mother] if she returned to [the country of habitual residence]; rather, the grave risk inquiry goes to the children."). The Court recognizes the possibility that abuse of a parent can result in a risk of harm to the abused parent's child who is unfortunate enough to be in the vicinity when the abuse occurs; such a child is at risk of indirect and/or unintended harm attendant to the abuse of the parent. *Simcox*, 511 F.3d 594. But the sole incident of physical abuse in 2013 does not satisfy Respondent's burden of demonstrating by clear

and convincing evidence that there is any risk, let alone a great risk, that the Children would be exposed to indirect and/or unintended harm.

First, applying the factors established by the Sixth Circuit in *Simcox*, the Court finds that the Respondent's allegation of Petitioner's abuse towards Respondent (and allegedly witnessed by the Children) falls into the first category of cases of relatively minor abuse. "In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a '*grave* risk[.]'" *Id.* at 607. That is not to say that the Court does not believe that the alleged physical conduct (dragging Respondent through the house by her hair resulting in three bruises) and verbal conduct (telling Respondent that she can hang herself) is alarming and very regrettable. However, the nature of this alleged conduct is less serious than abuse categorized by the Sixth Circuit as somewhere between minor and intolerable. For example, in *Simcox*, the petitioner had repeatedly beat his children including by hair pulling, ear pulling, and belt-whipping. *Id.* at 599. He also on one occasion banged the respondent's head against a passenger window of a vehicle in which they were traveling, on numerous occasions called the respondent bad names, and struck her in front of the children. *Id.* Although the Sixth Circuit noted that the incidents of abuse occurred with extreme frequency, it nevertheless categorized this as abuse within the middle category because "[t]he abuse . . . [was] somewhat less serious than the abuse in which other courts have refused to order return . . . [b]ut [was] also decidedly more serious than the abuse in those cases, . . . , in which courts have declined to find a 'grave risk' of harm." *Simcox*, 511 F.3d at 609. In comparison, given its nature and (in)frequency, the alleged conduct of Petitioner here is clearly less serious than the abuse in *Simcox*. Accordingly, the risk of harm caused by return of the child due to the abuse suffered by Respondent does not rise to the level of a "grave risk." *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("[T]he court must return the abducted child to its country of habitual

residence so that the courts of that country can determine custody. . . . [t]his policy of deterrence gives way to concern for the welfare of the child *only in extreme cases*.") (emphasis added).

Second, Respondent has not established that there is any risk of future incidents of physical or psychological abuse toward the Children (or, for that matter, Respondent). Respondent testified that after Petitioner and Respondent separated for the first time in 2014, there were no other incidents of physical abuse towards her. With the relationship over, Petitioner presumably would be deprived of the circumstances abusers typically leverage to commit their atrocities: a private space where the abuser has access to the victim without the presence of another person capable (and desirous) of stopping or preventing the abuse. Even assuming Petitioner had, and took advantage of, such opportunities during the course of his intimate relationship with Respondent, that does not suggest he would have such opportunities long after their relationship ended. In addition, although Respondent testified that Petitioner was verbally abusive, she did not claim that any verbal abuse occurred while Petitioner and Respondent were outside the living room of their apartment. As with the physical abuse, there is nothing in the record to suggest substantial risk that verbal abuse would occur now that Petitioner and Respondent's relationship is over.

The Court next turns to the two instances of alleged abuse of the Children, *i.e.*, Petitioner's alleged biting of PGST (perhaps while playing with PGST) on the buttocks leaving a bruise and swelling, and Petitioner's allegedly striking of EAST with a comb on the leg in response to the child throwing a ball at the television. Even if the Court were to credit the testimony of Respondent regarding these two incidents, which it does not, these incidents also (at most) fall into that category of cases of relatively minor abuse and would be insufficient to satisfy Respondent's burden in demonstrating that returning the Children to Venezuela exposes them to a grave risk of harm. Given its nature and (in)frequency, the alleged abuse of EAST and PGST does not raise to

"grave"-level the risk of harm occasioned by the contemplated return of the Children to Venezuela. First, both of these incidents are approximately five years old and can only be described as isolated and sporadic. Second, the conduct cannot be classified as serious. They clearly do not establish that Petitioner would subject the Children to serious abuse or neglect if the Children were returned to Venezuela.

Accordingly, the Court finds that Respondent has not proved by clear and convincing evidence that there is a grave risk that returning EAST and PGST to Venezuela "would expose the child[ren] to physical or psychological harm[.]" Convention, art. 13(b).

### B. Grave Risk of Intolerable Situation.

Next, the Court must determine whether return of the Children would expose them to an "intolerable situation." First, Respondent argues that the Children would face an intolerable situation upon their return to Venezuela because the Venezuelan courts are unable to properly adjudicate the custody dispute. In particular, Respondent points to alleged corruption and Petitioner's undue influence in Venezuelan courts. As discussed above, the Sixth Circuit has held that Article 13(b)'s "intolerable situation can encompass situations where one parent seeks to return a child to a country where courts are unable to adjudicate custody." *Pliego*, 843 F.3d at 233. The undersigned is not naïve, and he fully understands how undue influence and myriad other circumstances sounding in corruption can render a judicial system unable to perform legitimate adjudication. However, Respondent has not demonstrated that the Venezuelan courts are corrupt or that Petitioner has undue influence. Therefore, Respondent has not shown that the Venezuelan courts are unable to adjudicate their custody dispute.

In support of her argument regarding the corruption of the Venezuelan courts, Respondent relies largely upon the testimony of William Medina, the lawyer representing her in the Venezuelan proceedings. Mr. Medina testified that he did not believe Respondent could get a fair

trial in Venezuela. In support of this proposition, Mr. Media testified that the Venezuelan courts have violated various Venezuelan laws in the course of the various proceedings between the parties.

First, Mr. Medina testified that when he filed a request to obtain power of attorney to act on behalf of Respondent, the Venezuelan court waited 150 days to grant the request. According to Mr. Medina, Venezuelan law compels the court to issue an order accepting or denying the power of attorney within three days. It is Mr. Medina's belief that the Venezuelan court waited 150 days in order to prevent Mr. Medina from asserting any defenses on behalf of Respondent. But Mr. Medina did not provide any basis for his assertion that this was the purpose of the delay. Further, although Mr. Medina testified that the Venezuelan court made findings and inspections during the 150 days, he did not provide any testimony on what these decisions were, whose favor they were in, or how they prejudiced Respondent. For these reasons, and because no final decision has been made in any of the Venezuelan proceedings, the Court has no reason to believe any decision made before the power of attorney was granted substantially prejudiced Respondent or that the purpose of the delay was to do the same. Therefore, the Court finds that this delay is insufficient to show that the court in Venezuela is incapable of adjudicating custody.

Second, Mr. Medina testified that Petitioner showed up late to court and missed a hearing in Venezuela regarding provisional custody of Respondent's property on June 17, 2019. Because Petitioner missed the hearing, the Venezuelan (trial)[27] court dismissed the case. On appeal, the court found that Petitioner's absence was justified due to illness and allowed the case to continue. According to Mr. Medina, this was a violation of Venezuelan law because Petitioner appeared at

---

[27] The Court uses the term "trial court" here to refer to what it understands to be the first-level court in Venezuelan proceedings.

the courthouse later that day and therefore the purported illness was not a legitimate basis to excuse Petitioner's earlier absence. However, Petitioner subsequently testified that he had been late to his court appearance because he had been at the hospital; it seems likely to the Court that Petitioner indeed had a legitimate reason along these lines to miss the hearing since, after all, the hearing was in furtherance of Petitioner's quest for custody and thus one he would have been motivated to attend rather than skip. The Court finds that the appellate decision to excuse Petitioner's absence does not indicate undue influence or corruption; still less does the appealed decision of the trial court (which ruled against Petitioner) show undue influence or corruption at the trial court level.

Third, Mr. Medina testified that on October 11, 2018 the Venezuelan court issued an order, which was uploaded to the Jurist 2000 system on October 16, 2018 (even though it was supposed to be uploaded the same day it was issued). Mr. Medina testified that the version of the order placed in the physical file located within the court clerk's office contained two sentences that were not included in the version uploaded to Jurist 2000. Mr. Medina testified that these two sentences favor Petitioner because (according to Mr. Medina) they relate to how long the order is to be in effect. However, based on the Court's review of the English translation of Respondent's Exhibit 11, it appears that the bold and underlined sentences—which Mr. Medina testified are the additional sentences—are a direct citation of a registration which occurred in early 2014. Furthermore, when questioned by the Court, Mr. Medina testified that he believed the two sentences were likely added to the original order—after it had been uploaded to Jurist 2000—because the judge decided to change the original order due to (according to the Court's understanding of the translation of Mr. Medina's testimony) "judicial insecurity related to the decision"; Mr. Medina did not indicate that the change was due to some sort of corrupt motive. Nor did he claim it was somehow indicative of corruption; he described the change is significant because it showed "the irregularity of the

administration." Moreover, the additional sentences do not appear to be material, thus making their addition unlikely to be the result of a corrupt motive. Furthermore, Mr. Medina testified on cross-examination that he was granted full access to both versions of the order, thus suggesting official transparency—rather than some sort of cover-up of wrongdoing—in connection with this change. In summary, although these additions may have been irregular and/or procedurally improper, the Court finds that this does not indicate corruption in the Venezuelan courts.

Finally, Mr. Medina testified that on June 6, 2019 he filed an opposition to the Venezuelan court's November 16, 2018 order granting Petitioner provisional custody of Respondent's house. As of December 6, 2019, Mr. Medina had not had an opportunity to be heard by the court regarding his opposition. According to Mr. Medina, this delay is a violation of Respondent's due process rights. This delay, as well as the examples of purported corruption, are not so severe as to indicate the Venezuelan courts are corrupt or that they would be unable to fairly adjudicate the custody dispute. The Court is under no illusion that the Venezuelan court system is ideal, and the Court recognizes that the Venezuelan proceedings have not been perfect. However, it seems axiomatic that no court proceedings anywhere are perfect, and lengthy delays can be caused by a number of reasons. This is especially true in light of the fact that Mr. Medina testified that (by order of the Venezuelan Supreme Court) courts in Venezuela are operating only between the hours of 8:30 a.m. and 1:00 p.m. Furthermore, the findings issued by the Venezuelan courts have not been one-sided. To the contrary, evidence has been provided that the decisions have come out variously in favor of Petitioner and in favor of Respondent. In fact, Mr. Medina testified that when he requested the recusal of the judge overseeing the parties' custody dispute in Venezuela, the Venezuelan Supreme Court found that the judge had been partial towards Petitioner and granted Mr. Medina's request. A new and impartial judge was then assigned to the matter. This indicates that the

Venezuelan court system features effective procedures designed to ensure that the parties will get a fair trial.

Nor has Respondent presented evidence demonstrating that Petitioner has undue influence in the Venezuelan courts. Respondent alleges that through his employment, Petitioner has developed a friendship with Amalia Saez. Ms. Saez was the mayor of Barquisimeto and is now head of the national CPNAI.[28] Respondent argues that as a result of his friendship with Ms. Saez, Petitioner has undue influence in the Venezuelan courts—specifically, in proceedings before the CPNAI. Respondent's only support for this assertion is her testimony that Petitioner threatened to speak with Ms. Saez if Respondent did not withdraw a complaint that she filed in 2014. But Petitioner testified that Ms. Saez is actually Respondent's friend. Petitioner denies ever threatening to call Ms. Saez or discussing any legal issues with her. Even if Respondent's allegation that Petitioner and Ms. Saez are friends is true, she has not shown or explained how this friendship provides Petitioner with undue influence. There was no testimony from Respondent that Ms. Saez is corrupt or would be willing and able to manipulate the judicial system on behalf of Petitioner. Respondent has failed to demonstrate that Petitioner has undue influence in the Venezuelan courts.

Second, Respondent argues that the civil instability in Venezuela would place the Children in an intolerable situation. Under this standard, the court must conduct "more than a cursory evaluation of [Venezuela]'s civil stability . . . it must encompass some evaluation of the people

---

[28] Respondent submitted as evidence two color photographs Petitioner posted on Instagram of a monument in Barquisimeto called "El Obelisco." (Respondent Ex. 23). The captions to the photographs written by Petitioner on Instagram indicate that he was employed to install the lights. Respondent also submitted as evidence an article (and English translation) regarding the lighting of the monument, which stated that the mayor's office and Ms. Saez were in charge of lighting the monument. (Respondent Ex. 24). Petitioner does not dispute that he installed the lights under the direction of Ms. Saez. However, this employment does not show that Petitioner and Ms. Saez are friends or that Petitioner can influence Ms. Saez's actions.

and circumstances awaiting [the] child[ren] in the country of [their] habitual residence." *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002).

The Court is aware of Venezuela's current political and economic situation. The Court understands that the country is in the midst of a partisan struggle to determine who its legitimate leader is. The Court also understands that the United States, and many other countries, squarely reject the notion that Nicholas Maduro is that person—a position consistent with Respondent's view that Maduro's current grip on power is illegitimate, a threat to her in particular, and a harbinger for a bad future for her children in Venezuela.

But the Court must assess whether the evidence of record in this case supports this view,[29] and, more generally, Respondent's view that the Children would be placed in an intolerable situation if returned to Venezuela. In this regard, Respondent relied primarily on evidence that there are frequently protests in the streets of Barquisimeto, her testimony about a single incident of criminal violence against her family in their home approximately eight or nine years ago, and Respondent's witnesses' testimony that the country was experiencing shortages of gas, water, food, electricity, and medication.[30]

_____

[29] The Court notes that it must decide this case based upon what is in the record, and not what the undersigned may personally be inclined to believe based on various news stories coming of Venezuela—which, in the Court's experience, paint a fairly dire picture of life in Venezuela at the moment. The Court strongly suspects that it could not have relied on such stories (because they are rank hearsay) or upon Rule 201 judicial notice of the kinds of facts asserted in such stories (because those facts likely cannot be said to be "generally known" within the Middle District of Tennessee, and the accuracy of the media sources asserting those facts likely can reasonably be questioned). And, to their credit, Respondent's counsel did not make this kind of dubious evidentiary proffer, but rather sought almost exclusively to present firsthand evidence of conditions in Venezuela; not for lack of effort, they came up short in showing that the conditions met the applicable standard for a cognizable defense.

[30] On each of January 28 and March 5, 2019, President Trump issued an executive order "with respect to Venezuela" These two executive orders were offered by Respondent as Exhibit No. 6. The Court has admitted these into evidence but, consistent with its discussion at trial, only for the

But Respondent has not demonstrated that Venezuela is a zone of war, famine, or disease as is required to trigger the "grave risk" exception. *See Friedrich II*, 78 F.3d at 1067 ("[T]here is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease."); *Silverman v. Silverman*, 338 F.3d 886, 900–01 (8th Cir. 2003) (finding that general regional violence in Israel does not establish a "zone of war").[31]

---

fact that they were issued, and not for the truth of any facts asserted in them. Whatever the relevance of the hearsay statements therein for which they were not admitted, and which will not be considered, the relevance of the fact that they were issued by the President is minimal. The mere fact of issuance tells us essentially only that the President thought an executive order concerning Venezuela should be issued. Because the hearsay in these executive orders is not admissible, and even if admissible would be entitled to little weight given its particular purpose and the inability to test its significance and reliability via cross-examination, these executive orders fail to move the needle for Respondent.

[31] The Court is aware of a recent unreported opinion from the District of Massachusetts that commented upon the current political and socioeconomic climate in Venezuela. *Avendano v. Balza*, No. 19-cv-10660, 2020 WL 897686 (D. Mass. Feb. 25, 2020). Based upon the expert testimony of the director of the Center for Political Studies at a university in Caracas and a journalist working in the child's town of habitual residence (Margarita Island), and various reports it apparently received into evidence, the court concluded that "the situation in Venezuela [is] analogous to countries experiencing war, famine, or disease, such as Syria, Somalia, Afghanistan, and Iraq." *Id.* at *11. Despite this conclusion, the court declined to decide whether "the grave risk exception" was applicable to the living conditions in Venezuela, and instead declined to return the child under the mature child exception. *Id.* at 8. The Court notes two significant, interrelated distinctions between Venezuela today and countries like Syria, Somalia and Afghanistan. First, despite the severe schisms and convulsions that exist in the political makeup of Venezuela today, they do not arise to the level of out-and-out civil war like those that have, heartbreakingly, plagued those other three unfortunate nations. Second, and in part because of the lack of civil war, it appears that Venezuela remains an integrated country. It is not as if one faction holds part of the territory of Venezuela and another faction holds the other part. And this integrated nation remains a party (signatory) to the Hague Convention in a sense that a hypothetical fractured country cannot be said to remain a party the way it hypothetically was when it was still an integrated country. Since Venezuela remains a party to the Hague Convention, the Court is loath to blithely declare the country the unworthy of the benefits of being a party—*i.e.*, declare the country as a whole a place unsuitable for the return of its child residents and a country whose citizen-parents' Hague Convention petitions should always founder based on a blanket Article 13(b) defense based on country conditions as a whole. Accordingly, the Court here has been very intentional in holding Respondent to her heavy burden to establish such a defense.

Moreover, the Court must evaluate the specific environment to which the Children are to be returned. And Petitioner's testimony paints a drastically different picture of what life would look like for the Children in Venezuela. Petitioner testified that he is able to avoid all protests by avoiding particular streets, he submitted a video of a grocery store near his home stocked with food and beverages, he submitted receipts demonstrating his ability to provide food and water for the Children, and he testified that the Children still have spots on their soccer teams as well as in the school that they were attending before their removal. Although Venezuela may lack some of the stability Respondent has found in Tennessee, the Children's return would not place them in an intolerable situation. *See Avendano v. Smith*, 2011 WL 5223041, at *22 (D.N.M. Aug. 19, 2011) ("Although Mexico is more dangerous than the United States at this time, the term intolerable situation was not meant to encompass return to a home where living conditions are less palatable.").

In *Mendez Lynch v. Mendez Lynch*, the court considered the political and economic crisis in Argentina in 2002. *Mendez Lynch,* 220 F. Supp. 2d at 1365–66. Although the court heard testimony that the country was in a crisis of uncommon proportions including, *inter alia*, violent demonstrations in the streets, a government and economic system that lacked legitimacy, and

---

Notably, a district court in the Southern District of Florida (also in an unreported opinion) reached the opposite conclusion from the District of Massachusetts in *Avendano. See Crespo Rivero v. Carolina Godoy*, No. 18-cv-23087, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018). In *Crespo*, the court considered the expert testimony of a journalist/ex-diplomat who testified that "a deteriorating economy and rampant inflation has led to a country-wide shortage of food and medicine." *id.* at *4, and a social worker who testified that the child was experiencing PTSD as a result of witnessing violent protests in La Urbina, *id*. Nevertheless, the court held that that "Venezuela's current political unrest does not rise to the level of 'zone of war, famine, or disease.'" *Id.* The court ordered the immediate return of the child to Venezuela, finding that the child's return would not put him in an intolerable situation. *Id.* at *5.

exceptionally high unemployment, the petitioner testified that the children would be returning home to a neighborhood without political demonstrations, a country club, the family dog, a school comparable with those they left, and a psychologist to ease their transition. *Id.* The court found that the children's return to Argentina would not place them in an intolerable situation. *Id.*

In the district court opinion on remand from the Sixth Circuit in the above-cited opinion *Pliego*,[32] the court rejected the respondent's (Hayes's) Section 13(b) defense to the return of her child to Turkey, reasoning:

> [T]he scant evidence of the potential for corruption or undue influence in Turkey does not rise to the level required for this affirmative defense. *See Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002). The Court already determined this issue in *Pliego I*. "Here, Hayes did not provide evidence that the political climate, judicial system, or conditions in Turkey would place the child in an 'intolerable situation.' Thus, she has not satisfied her burden under this affirmative defense."

*Pliego v. Hayes* [*Pliego II*], No. 5:150-cv-0146, 2015 WL 4464173, at *10 (W.D. Ky. July 21, 2015) (quoting *Pliego v. Hayes,* 2015 WL 269207 (W.D. Ky. Jan. 21, 2015)), *aff'd*, 843 F.3d 226 (6th Cir. 2016).

The Court concludes likewise in this case. Upon evaluating the circumstances awaiting the Children in Venezuela, the Court finds Respondent has not shown by clear and convincing evidence that there is a grave risk that the Children's return to Venezuela would place the Children in an intolerable situation.[33]

---

[32] As suggested in the quote below, for reasons not relevant here, in *Pliego* there had been a prior district court opinion (called "*Pliego I*" in the quote below) regarding the same child. The later district court opinion quoted here will be referred to as "*Pliego II.*"

[33] The Court notes that there may be an arrest warrant for Respondent in Venezuela. It is unclear whether any such arrest warrant would be based on her use of a false document to leave the country or on her failure to appear in court. In any event, the potential negative effects upon Respondent from possible criminal exposure in Venezuela does not rise to the level of an "intolerable situation" for the Children sufficient for a successful affirmative defense. *See Pliego II*, 2015 WL 4464173, at *10 (W.D. Ky. July 21, 2015), *aff'd*, 843 F.3d 226 (6th Cir. 2016). Moreover, it does not help

**IV. Conclusion**

Respondent here faced the Hague Convention's formidable hurdles to preventing the return of children wrongfully removed from their country of habitual residence. To surmount those hurdles, counsel for Respondent clearly amassed and presented a significant amount of relevant information to support several different theories for a defense under Article 13(b) of the Convention. The challenge was compounded by counsel's unavoidable reliance upon foreign documents, and hazy and contradicted (translated) testimony. The challenge was simply too great. The Court understands where Respondent was going, but Respondent simply could not get there; by conveying a general portrait, as well as specific anecdotes, related to her defenses, Respondent's counsel provided a basis for concluding that it may not be best for the Children to return to Venezuela. But confronted with conflicting testimony and documents, credibility issues for their key witness, unfavorable case law, counsel was unable to satisfy that applicable "clear and convincing" standard for its Article 13(b) defense(s).

Perhaps the Court would see things differently if this case were some sort of referendum on the Maduro regime, with the Court casting the sole vote. But it is not. And perhaps the Court's decision would be different if this case was to be decided based on the Court's opinion as to whether it is far preferable to live in Tennessee than in Venezuela at this time. But it is not. Instead, this case is about whether Respondent has met her heavy burden to establish, with admissible evidence, a cognizable defense to the Children's return. She has not.

---

Respondent that the issuance of any such arrest warrant arguably was brought about by Respondent's own actions. *See id.* But in the final analysis, the Court can only speculate about the existence, cause or consequences of an arrest warrant, and so these topics play no part in the Court's decision.

In summary, as the Supreme court recently stated, "the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky v. Taglieri*, --S.Ct.--, 2020 WL 889191, at *3 (Feb. 25, 2020). The ordinary result applies in this case.[34]

For the above-mentioned reasons, the Court will **GRANT** the Petition and **ORDER** that EAST and PGST, the Children of Petitioner and Respondent, be returned to their habitual residence in Venezuela.

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[34] That is not to callously suggest that the outcome, and its effects on a personal level, should seem "ordinary" to these litigants themselves. It is, instead to say that this is the results that generally applies where, as here, there is no question that Petitioner has establish the wrongful removal of the child(ren).